Kirk Pasich (SBN 94242)
KPasich@PasichLLP.com
Anamay M. Carmel (SBN 298080)
ACarmel@PasichLLP.com
Caitlin S. Oswald (SBN 330974)
COswald@PasichLLP.com
10880 Wilshire Boulevard, Suite 2000
Los Angeles, California 90024
Telephone:  (424) 313-7860
Facsimile:  (424) 313-7890

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PARAMOUNT PICTURES CORPORATION, a Delaware corporation,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>FEDERAL INSURANCE COMPANY, an Indiana corporation,<br><br>　　　　Defendant. | Case No. 2:21-cv-06975<br><br>**COMPLAINT FOR:**<br><br>BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Paramount Pictures Corp. ("Paramount") complains of defendant Federal Insurance Company ("Federal") and alleges as follows:

## NATURE OF THIS LAWSUIT

1.　　Federal sold Paramount a Production Package Policy designed to insure Paramount against losses resulting from delays and interruptions of the production of the motion picture *Mission Impossible 7*.  Recognizing the significant expenses (and concomitant risk) incurred in the production of major motion pictures, Federal agreed to and issued a policy that would pay up to a limit that exceeded $100,000,000 in connection with each single loss.

2.      The production was delayed for various reasons, including the threat posed to covered persons by SARS-CoV-2 and COVID-19, the orders of civil authorities restricting or preventing the production from continuing as planned, and Paramount's efforts to reduce or prevent losses that otherwise would be insured under the policy.  As a result of those delays in production, Paramount incurred significant losses, which are insured under multiple coverages in the policy.

3.      Paramount's losses are well within the limits of the policy (indeed, Paramount's aggregate losses are well within the $100+ million limit for each single loss).  However, when Paramount sought payment for the full amount of its insured losses under the policy, Federal refused.  Federal arbitrarily categorized several of Paramount's losses as subject to only one limited category of coverage (which provided for coverage of just $1 million in connection with each single loss), and unjustifiably refused to cover other losses altogether.  Ultimately, Federal paid only a small portion of Paramount's losses, denying coverage for the majority of them.  By doing so, Federal breached the parties' contract.  Furthermore, Federal acted unreasonably, choosing to favor its interests over those of its insured, tortiously breaching the implied covenant of good faith and fair dealing.  Paramount is entitled to damages for these breaches plus punitive damages.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction under 28 U.S.C. section 1332 based on complete diversity of citizenship between the parties and because the amount in controversy, exclusive of costs and interest, exceeds $75,000.

5.      This Court has personal jurisdiction over Federal because Federal conducts business in the County of Los Angeles.

6.      Venue is proper in the Central District of California pursuant to 28 U.S.C. section 1391 because a substantial part of the events or omissions giving rise to Paramount's losses occurred in this District and because, as the policy states,

2
**COMPLAINT**

Federal's "Producing Office" is in Los Angeles and the insurance broker is in Culver City.

## THE PARTIES

7. Paramount is a Delaware corporation whose principal place of business is in Los Angeles, CA. Paramount is a studio, production company, and distributor of film and television productions. Paramount is the studio behind the motion picture *Mission Impossible 7*, the seventh installment in the popular franchise.

8. Federal is an Indiana corporation whose principal place of business is in New Jersey. Paramount is informed and believes, and on that basis alleges, that at all times material hereto, Federal was licensed to transact, and did transact, business in California and in this District. Federal issued the policy through its Los Angeles office.

9. Paramount is informed and believes, and on that basis alleges, that Federal is part of the Chubb group of insurance companies. Chubb Limited is the ultimate parent of Chubb and the other insurance companies that are part of the Chubb Group of Insurance Companies (for convenience, Chubb and the other Chubb companies hereinafter collectively are referred to as "Chubb").

10. Chubb makes statements and representations on behalf of Federal and its other member companies on its website.[1] Chubb uses its website to market its insurance products; represent the nature of its insurance products, policy underwriting, and claims handling; and represent the quality of insurance and services its customers will get if they do business with it.

11. Chubb has long represented to the public and to its customers, including Paramount, that it has special expertise in providing insurance to companies and individuals in the entertainment industry. For example, touting its experience in the entertainment industry, Chubb states as follows on its website:

---

[1] https://www.chubb.com/us-en/home.html.

**COMPLAINT**

With more than 50 years of experience in the
entertainment industry, we understand the challenges and
opportunities shaping the future, and we use our deep
expertise, specialized products and services, and strong
claims capabilities to help protect your businesses,
regardless of its size.[2]

12.    Under the title "We know entertainment," Chubb states:

We understand the changes happening in your industry
and put our specialized knowledge to work for you, with
products and services tailored to address the unique needs
of entertainment businesses like yours.[3]

13.    On its website, Chubb poses the question: "How is Chubb, different?"
It answers as follows:

We don't just process claims, we make things right.  We
hope you never need to file a claim with us.  But if you do,
that's our opportunity to show you what "craftsmanship"
means in service to you.  It means Chubb people working
with empathy, integrity, and our legendary attention to
detail to make you whole.  ***It means we honor the
promises we've made to you.***  Your loved ones, your
employees, your home, your business reputation—these
things matter.  These things are personal, for you and for
us.

We're here to help.[4]

---

[2] https://www.chubb.com/us-en/campaign/pacific-campaign/pacific-tech/rediscover-entertainment/index.html.
[3] *Id.*
[4] https://www.chubb.com/us-en/claims/claims-difference.aspx (emphasis added).

14.     Chubb understands that because of the pandemic and subsequent orders, businesses, including Paramount, had to take steps to mitigate or reduce losses.  As Chubb publicly stated on its website:

> Our hearts go out to those affected by the COVID-19 pandemic.  We have been – and stand ready to continue – supporting our clients, distribution partners and communities.[5]

15.     Chubb also has represented, and represents to the public:

> **"Unprecedented events require unprecedented service"**
> For over 200 years, we have worked hand-in-hand with our clients to help them rebuild – it's in our DNA.  In response to the COVID-19 pandemic, we have created several programs to support our clients and the communities where they live.[6]

16.     Chubb further represents:

> **"Our commitment to clients"**
> We stand with our clients as partners in their business.  In 2019 alone, we received 3.6 million new claims and made more than $18.3 billion in claims payments.  And, as the world changes – and new and never-before-seen threats emerge – Chubb takes pride in our continuing commitment to our clients.[7]

17.     Indeed, Chubb itself has undertaken steps in connection with its in-person events to protect against the spread of SARS-CoV-2 and COVID-19:

---

[5] https://www.chubb.com/microsites/covid19-resource-center/index.html.
[6] https://www.chubb.com/microsites/covid19-resource-center/doing-our-part.html.
[7] *Id.*

1  During the first quarter of 2020, worldwide social and
2  economic activity became severely impacted by the spread
3  and threat of COVID-19.  We have taken actions to
4  minimize risk to our employees, including restricting
5  travel and instituting extensive work-from-home
6  protocols.[8]

7  **FEDERAL'S KNOWLEDGE OF THE RISK OF A PANDEMIC**

8  18.  Federal and other insurers were repeatedly warned over the years of the
9  potential impact of pandemics.  In fact, in the months and years before the outbreak
10  of the COVID-19 pandemic, there were many publicly available reports about the
11  risks of pandemics and what insurers should do.  For example, in March 2018, one
12  insurance industry publication cautioned:

13  Even with today's technology, a modern severe pandemic
14  would cause substantive direct financial losses to the
15  insurance community.  In addition, indirect losses would
16  be severe, most notably on the asset side of the balance
17  sheet.[9]

18  19.  One insurance industry repository shows the "tip of the iceberg" about
19  how much information was available to insurers on the risk of pandemics.  The
20  Insurance Library Association of Boston, founded in 1887, describes itself as "the
21  leading resource for and provider of literature, information services, and quality
22  professional education for the insurance industry and related interests.[10]  The
23  Association states on its website:

24
25  [8] https://s1.q4cdn.com/677769242/files/doc_financials/2020/q1/Chubb-Limited-1Q-2020-Form-10-Q.pdf.
26  [9] *What the 1918 Flu Pandemic Can Teach Today's Insurers*, AIR (Mar. 29, 2018),
27  https://www.air-worldwide.com/publications/air-currents/2018/What-the-1918-Flu-Pandemic-Can-Teach-Today-s-Insurers/.
28  [10] http://insurancelibrary.org/about-us/.

6
COMPLAINT

> The past 20 years [have] seen the rise of a number of
> pandemics.  *Slate* recently published an article on what has
> been learned about treating them in that time.  We thought
> it might be apt for us to take a look back and see what the
> insurance industry has learned as well.[11]

The Association then lists more than 20 articles, reports, and white papers published since at least 2007, long before Federal sold Paramount the policy at issue here.

20.     One white paper warned as early as 2009 of a pandemic's potential consequences for the insurance industry:

> It is highly unlikely that the insurance industry would have
> the financial reserves to meet the worldwide claims arising
> out of a pandemic of this size.[12]

21.     Thus, Federal has known, or should have known, for years that its policies would be called on to pay perhaps hundreds of millions of dollars or more to its insureds and, more specifically, knows that it could be obligated under its policies to pay tens of millions of dollars to Paramount for losses associated with viruses and pandemics.

22.     Given the potential liability that insurers, including Federal, faced under their policies for losses from pandemics shortly after the outbreak of SARS in 2003, the insurance industry drafted exclusions applicable to losses from viruses and bacteria.

23.     On July 6, 2006, the Insurance Services Office ("ISO"), the insurance industry's drafting organization, prepared a circular that included a standard exclusion of loss due to viruses and bacteria as part of its filing with state insurance

---

[11] http://insurancelibrary.org/pandemics-and-insurance/.

[12] Allan Manning, *White Paper on Infectious Disease Cover* (updated 2009), http://www.lmigroup.com/Documents/Articles/White%20Paper%20on%20Infectiou s%20Disease%20Cover.pdf?mc_cid=f0cee24803&mc_eid=41023ebc2c.

regulators.[13]  In that circular, it noted that examples of "viral and bacterial contaminants are rotavirus, SARS, [and] influenza," observing that "[t]he universe of disease-causing organisms is always in evolution."[14]

24.     In fact, ISO expressly warned that "the specter of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing [property] policies may face claims in which there are efforts to expand coverage and create sources of recovery for such losses, contrary to policy intent."[15] ISO introduced a standard-form exclusion entitled "Exclusion Of Loss Due to Virus or Bacteria" (Form CP 01 40 07 06 and, in certain jurisdictions, Form CP 01 75 07 06).

25.     Since then, many insurers, including Chubb, have included virus and pandemic exclusions in many of their insurance policies in an attempt to minimize the amounts they could have to pay for losses associated with viruses and pandemics.

26.     Thus, since at least 2006, Federal could have used a "virus or bacteria" exclusion approved for use throughout the United States.  As one recent article succinctly stated, "Insurers knew the damage a viral pandemic could wreak on businesses.  So they excluded coverage."[16]

---

[13] "ISO is a nonprofit trade association that provides rating, statistical, and actuarial policy forms and related drafting services to approximately 3,000 nationwide property or casualty insurers.  Policy forms developed by ISO are approved by its constituent insurance carriers and then submitted to state agencies for review.  Most carriers use the basic ISO forms, at least as the starting point for their general liability policies." *Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal. 4th 645,671 n.13 (1995); *see also* ISO Circular, "New Endorsements Filed to Address Exclusion of Loss Due to Virus or Bacteria," (July 6, 2006), https://www.propertyinsurancecoveragelaw.com/files/2020/03/ISO-Circular-LI-CF-2006-175-Virus.pdf.

[14] *Id.*

[15] *Id.*

[16] Todd Frankel, *Insurers knew the damage a viral pandemic could wreak on*

27.     However, even though Federal was aware of the massive losses that its insureds, including Paramount, could face from a virus-related pandemic, it sold Paramount the policy at issue without a virus, pandemic, or any other potentially applicable exclusion.

### THE POLICY

28.     Motion picture studios and production companies typically buy production insurance policies that provide broad coverage to the insureds from a wide range of losses that they may incur if productions are disrupted.

29.     Federal sold Paramount Inland Marine Insurance Policy No. 7997-43-91 (the "Policy") for the stated period of September 3, 2019, to December 31, 2021. The Policy contains a Production Package Policy Form designed to protect Paramount from losses incurred from delays and disruptions in the production of the motion picture *Mission Impossible 7*.

30.     The Policy provides multiple coverages designed to protect Paramount. The coverages include $100,000,000 in Cast coverage, $1,000,000 in Civil Authority coverage, and $1,000,000 in Delay Beyond Control coverage.  These limits of liability apply separately to "any one loss, any one declared production." Policy, Conditions § III.

31.     The Policy contains a "Due Diligence Clause."  This clause states:

> You shall use due diligence and do and concur in doing all things reasonably practicable to avoid or diminish any loss or any circumstance likely to give rise to a loss or claim insured under this policy.  It is agreed that this policy extends to indemni[f]y You for Your loss and/or additional expenses and/or increased costs incurred by You to avoid

---

*businesses.  So they excluded coverage*, WASH. POST (Apr. 2, 2020), https://www.washingtonpost.com/business/2020/04/02/insurers-knew-damage-viral-pandemic-could-wreak-businesses-so-they-excluded-coverage/.

**COMPLAINT**

1        or diminish any such loss or claim, subject to any

2        Deductible stated on the COVERAGE SCHEDULE,

3        provided, however, that in no circumstance shall Our

4        maximum liability under this policy be greater than the

5        increased costs and/or additional expenses incurred, or in

6        any event exceed the limits of liability of this policy.

7  *Id.*, Conditions § VI.F.

8       32.    The Policy also contains a Loss Procedure condition stating that

9  Paramount shall "[p]rotect the property from further loss and take all reasonable

10  steps possible to minimize the loss."  The Policy further states that "[i]f expenses are

11  incurred in doing so, they shall be borne by [Federal]."  *Id.*, Conditions § VI.M.1.

12       33.    Under the Cast coverage, Federal agreed to pay for "loss" that

13  Paramount

14        directly and solely sustain[s] by reason of any **covered**

15        **person(s)** in connection with an insured production, being

16        necessarily prevented by their death, injury, sickness or

17        kidnapping . . . from commencing or continuing or

18        completing their respective duties in an insured production.

19  *Id.*, Cast Coverage § I.A.

20       34.    "**Covered person**" means "any artist, director, producer, animal,

21  animator, special effects or camera personnel or any other individual You deem to

22  be necessary to complete the production."  *Id.*, Conditions § VII.A.

23       35.    The Cast coverage defines "loss" as

24        any extra expenditure [Paramount] incur[s] in completing

25        an insured production over and above the expenditure

26        which, but for the happening of any one or more of the

27        occurrences specified in Paragraph I. INSURING

28

PASICH

1    AGREEMENT above, would have been incurred in

2    completing said production.

3    *Id.*, Cast Coverage § VI.1.

4    36.    The Cast coverage includes "loss . . . directly resulting from the

5    unavailability of a **covered person(s)** due to . . . [d]elays resulting from the threat of

6    bodily injury." *Id.*, Cast Coverage § I.B.2.

7    37.    The Cast coverage also insures "actual loss [Paramount] incur[s] due to

8    the actual or potential impairment of an insured production caused by or resulting

9    from a crisis event that . . . results in the immediate suspension of production." *Id.*,

10   Cast Coverage § I.C.2.

11   38.    The Extra Expense coverage extends coverage to insure losses resulting

12   from the actions of a Civil Authority and delays caused by acts beyond Paramount's

13   control.

14   39.    Under the Civil Authority extension of coverage, Federal agreed to pay

15   for "loss . . . directly resulting from . . . [t]he action of a Civil Authority that

16   prohibits access to property or facilities." *Id.*, Extra Expense Coverage, § I.B.2.

17   40.    Under the Delay Beyond Control extension coverage, Federal agreed to

18   pay for "loss . . . directly resulting from . . . [d]elay caused by acts beyond

19   [Paramount's] control." *Id.*, Extra Expense Coverage, § I.B.4.

20   41.    The Extra Expense section of the Policy defines "loss" as

21   any extra expenditure [Paramount] incur[s] in completing

22   an insured production over and above the expenditure

23   which, but for the happening of any one or more of the

24   occurrences specified in Paragraph I. INSURING

25   AGREEMENT above, would have been incurred in

26   completing said production.

27   *Id.*, Extra Expense § VI.1.

28   **THE COVID-19 PANDEMIC**

1    **AND THE ENSUING CIVIL AUTHORITY ORDERS**

2    42.    In 2020, SARS-CoV-2 and the disease it causes, COVID-19, spread

3    throughout the world, prompting the World Health Organization to declare a global

4    pandemic.

5    43.    As explained by the World Health Organization:

6           We know that the disease is caused by the SARS-CoV-2

7           virus, which spreads between people in several different

8           ways.

9           The virus can spread from an infected person's mouth or

10          nose in small liquid particles when they cough, sneeze,

11          speak, sing or breathe. These particles range from larger

12          respiratory droplets to smaller aerosols.

13          Current evidence suggests that the virus spreads mainly

14          between people who are in close contact with each other,

15          typically within 1 metre (short-range). A person can be

16          infected when aerosols or droplets containing the virus are

17          inhaled or come directly into contact with the eyes, nose, or

18          mouth.

19          The virus can also spread in poorly ventilated and/or

20          crowded indoor settings, where people tend to spend longer

21          periods of time. This is because aerosols remain suspended

22          in the air or travel farther than 1 metre (long-range).

23          People may also become infected by touching surfaces that

24          have been contaminated by the virus when touching their

25          eyes, nose or mouth without cleaning their hands.[17]

26

27
_____
28  [17] *See* https://www.who.int/news-room/q-a-detail/coronavirus-disease-covid-19-
how-is-it-transmitted.

44.   Published reports state that the spread of SARS-CoV-2 is insidious because it can be readily transmitted by asymptomatic individuals—about 40% of all individuals who have COVID-19 are asymptomatic.[18]  Additionally, reports state that pre-symptomatic persons carry the greatest viral load (i.e., the quantity of virus in an individual's system) among all infected persons, meaning their ability to transmit SARS-CoV-2 is greater than that of symptomatic persons.[19]

45.   It is widely recognized that "confirmed" cases of COVID-19 do not tell the full story.  Reports explain, for example, that many individuals with COVID-19 are asymptomatic and therefore are not tested for the disease.  Because of the initial absence of available tests, asymptomatic infections, and differential symptomatic diagnoses, researchers believe that the true number of individuals infected with SARS-CoV-2 in 2020 was significantly higher than the reported numbers might suggest.[20]

46.   Published reports also state that aerosolized droplets exhaled by normal breathing can travel significant distances and stay suspended in the air and infective

---

[18] Ellen Cranley, *40% of people infected with COVID-19 are asymptomatic, a new CDC estimate says*, BUSINESS INSIDER (July 12, 2020), https://www.businessinsider.com/cdc-estimate-40-percent-infected-with-covid-19-asymptomatic-2020-7.

[19] Xi He, et al., *Temporal dynamics in viral shedding and transmissibility of COVID- 19*, 26 NATURE MED. 672, 674 (Apr. 15, 2020), https://www.nature.com/articles/s41591-020-0869-5 ("We detected high viral loads soon after symptom onset, which then gradually decreased towards the detection limit at about day 21. . . . Our analysis suggests that viral shedding may begin 5 to 6 days before the appearance of the first symptoms.  After symptom onset, viral loads decreased monotonically, consistent with two recent studies.").

[20] Smith-Schoenwalder, *CDC Study: Coronavirus Infection Numbers May Be up to 24 Times Higher Than Reported*, U.S. NEWS (July 21, 2020), https://www.usnews.com/news/national-news/articles/2020-07-21/cdc-study-coronavirus-infection-numbers-may-be-up-to-24-times-higher-than-reported; Michael A. Johansson, et al., *SARS-CoV-2 Transmission From People Without COVID-19 Symptoms*, J. AM. MEDICAL ASS'N (Jan. 7, 2021), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2774707.

for 16 hours, until gravity ultimately forces them on to the nearest surface.[21]  These reports and studies explain that SARS-CoV-2 spreads primarily through fine aerosolized viral droplets that are expelled into the air when infected individuals breathe, talk, sing, cough, or sneeze.

47.     Scientists have likened the ubiquitous aerosolized droplets of the virus to smoke present in the air long after the source of its dissemination has gone.[22]  Thus, according to studies and reports, entering a location where the SARS-CoV-2 virus is physically present in the air poses an imminent and severe risk to human health.

48.     As of the filing of this Complaint, there have been more than 216,229,741 confirmed cases of COVID-19 throughout the world with more than 4,496,681 deaths.[23]  In the United States, there have been more than 38,875,807 confirmed cases of COVID-19 with more than 637,356 deaths.[24]  Moreover, due in part to the initial absence of available tests, it has been reported that, at least in the United States, the number of people infected within SARS-CoV-2 in 2020 may be ten times higher than reported.[25]

49.     Since the outbreak of SARS-CoV-2 and COVID-19, and in response to it, civil authorities throughout the world issued "stay-at-home" and "shelter-in-place" orders, travel restrictions, quarantines, and other orders, including orders requiring the suspension of non-essential business operations (collectively, "Closure

[21] *See* Leslie Tate, *Virus Survives In Air For Hours,* TULANIAN (Fall 2020), https://tulanian.tulane.edu/fall-2020/virus-survives-in-air-for-hours.
[22] *See* Kimberly A. Prather, et al., *Airborne Transmission of SARS-CoV-2*, SCIENCE (Oct. 16, 2020), https://science.sciencemag.org/content/370/6514/303.2.
[23] *See* https://covid19.who.int/.
[24] *See* https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.
[25] Fiona P. Havers, et al., *Seroprevalence of Antibodies to SARS-CoV-2 in 10 Sites in the United States, March 23-May 12, 2020*, JAMA INTERNAL MEDICINE (July 21, 2020), https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2768834.

Orders").[26]  In relevant part, the Closure Orders required citizens to stay at home, prohibited large gatherings, and mandated the continued closure of all non-essential in-person businesses, including film productions.

50.     Paramount suffered significant losses and damages covered by the Policy when it was forced to suspend and postpone production of *Mission Impossible 7* due to Closure Orders affecting different filming locations, cast illnesses, and the need to protect cast and crew and its locations from exposure to SARS-CoV-2.

## FEDERAL'S BREACHES AND WRONGFUL CONDUCT

51.     Production on *Mission Impossible 7* was originally scheduled to begin in Venice, Italy on February 24, 2020.  On or about February 21, 2020, Paramount shut down production due to the illness of a **covered person** that prevented that individual from continuing to work.  Paramount timely notified Federal of this loss.

52.     Due to the **covered person**'s illness, filming was then reset to begin in Rome in March 2020.  However, on March 8, 2020, the national government of Italy imposed a quarantine order that affected Venice, and then expanded it to all of Italy on March 9, 2020.  For the second time, production on *Mission Impossible 7* had to be rescheduled.

53.     Production resumed in July 2020.

54.     In October 2020, during production in Rome, an outbreak of COVID-19 among crew occurred along with potential exposure to other cast and crew members.  Production on *Mission Impossible 7* was then shut down for a third time.

55.     To mitigate further loss in Rome, production moved to Venice in late October 2020.  After production resumed on October 21, 2020, certain members of the crew and background extras tested positive for COVID-19.  For the fourth time, production had to be suspended.

---

[26] *See, e.g.*, *The Council of State Governments, COVID-19 Resources for State Leaders*, https://web.csg.org/covid19/executive-orders/.

56.     On February 13, 2021, production on *Mission Impossible 7* was scheduled to begin in the United Kingdom.  However, because of a surge of COVID-19 cases in the UK, and the proliferation of a more lethal and contagious variant of SARS-CoV-2 in the UK, production was suspended for the fifth time.

57.     Production then resumed in Abu Dhabi.  But before being able to return to complete production in the UK, the UK government required that all non-UK citizens quarantine for ten days upon entry.  This requirement caused a sixth delay in production.

58.     In June 2021, while filming in the UK, following more positive tests for COVID-19 among cast and crew, production was shut down for the seventh time.

59.     Following each of the suspensions in production, Paramount timely notified Federal of the delay and the losses it would incur due to the interruptions and to reduce the possibility of additional covered claims.  Paramount informed Federal that its losses included costs to move locations, restart production, and comply with COVID-19-related safety protocols.

60.     Over the 18 months since production of *Mission Impossible 7* was first shut down because of a covered cause of loss, Paramount provided Federal with information pertaining to its losses.

61.     Ultimately, Federal contended that only part of Paramount's claimed losses were covered under the Policy. Specifically, on July 1, 2020, Federal wrote to Paramount, stating that it would pay for the losses caused by the **covered person**'s illness in February 2020 subject to its adjustment of the submitted covered expenses. However, Federal stated that the $100,000,000 Cast coverage was not available for most of the remaining portions of Paramount's losses.  Federal claimed that Paramount's losses arising from the pandemic, orders of civil authorities, and the need to mitigate could only be covered under the Policy's Civil Authority coverage, and then that all the losses would be subject to a single $1,000,000 limit of liability.

Federal also asserted that the various suspensions and relocations constituted a single loss, despite having occurred in different locations at different times and because of different Closure Orders.  Federal also refused to acknowledge that the costs to comply with COVID-19 safety protocols are insured under the Policy.

62.     Federal also refused to pay for the losses incurred by Paramount when its cast and crew members tested positive for COVID-19 followed by a necessary shut down of production.  Remarkably, Federal stated that there was no evidence that those cast and crew members could not continue their duties, despite being infected with SARS-CoV-2 and posing an undeniable risk to other individuals involved with the production.

63.     Federal also stated, contrary to the guidance of the world's leading health and medical authorities, that it did not see how incurring costs for COVID-19-related safety protocols, such as personal protective equipment, could reduce a covered loss.

64.     By taking these positions, Federal has deprived Paramount of the full coverage to which it is entitled under its Policy, including under the Cast coverage, the Civil Authority extension of coverage, the Delay Beyond Control extension of coverage, the Due Diligence Clause, and the Loss Procedure condition, as well as the common law doctrine of mitigation.

65.     Paramount is entitled to Cast coverage under the Policy for the losses incurred from the suspensions and delays in production of *Mission Impossible 7*, as well as the costs and losses it incurred and continues to incur in its reasonable efforts to minimize, prevent, and mitigate losses otherwise insured under the Policy. Production was postponed because of the widely reported dangers posed by SARS-CoV-2 and COVID-19, the issuance of the Closure Orders, and outbreaks of COVID-19 among its cast and crew.  Paramount was also required "to avoid or diminish a loss or circumstance that may give rise to a loss or damage."  By halting production, Paramount did exactly that.

66.     On or about July 19, 2021, Federal paid $5,000,000 for the losses associated with the **covered person**'s illness in February 2020.  Federal asserted that this payment was a partial payment for Cast coverage.  Paramount accepted this payment as mitigation of its damages and without waiving any of its rights.  To date, Federal has refused to pay any more towards Paramount's losses, even though Paramount's losses far exceeded this amount as of the filing of this Complaint.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

67.     Paramount realleges and incorporates by reference paragraphs 1 through 66 above.

68.     By acting as alleged above and by failing and refusing to pay Paramount for the full amount of its losses under each applicable coverage, Federal breached its duties under the Policy.

69.     As a direct and proximate result of Federal's breaches, Paramount has sustained, and continues to sustain, damages in an amount to be proven at trial above this Court's jurisdictional limit.

## SECOND CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

70.     Paramount realleges and incorporates by reference paragraphs 1 through 69 above.

71.     Implied in the Policy is a covenant that Federal would act in good faith and deal fairly with Paramount, that Federal would not interfere with the rights of Paramount to receive benefits due under the Policy, and that Federal would give at least the same level of consideration to Paramount's interests as it gave its own interests.

72.     Federal also had a duty under the Policy, the law, and insurance industry custom, practice, and standards to honor the terms of insurance promised under the Policy.

73. Instead of complying with these duties, Federal acted in bad faith by, among other things,

      a) attempting to restrict the insurance available under the Policy to only that insurance available under the Civil Authority coverage for a single loss;

      b) insisting that Paramount's losses under the Policy do not include the costs to comply with COVID-19 safety protocols;

      c) failing to promptly conduct a full and thorough investigation of the bases that would support Paramount's claim for coverage;

      d) creating and implementing a pattern and course of action to restrict coverage for Paramount's losses and to pay less for those losses than it is obligated to pay under the Policy;

      e) unreasonably failing and refusing to honor its promises and representations in the Policy;

      f) unreasonably refusing to pay the full amount due under the Policy;

      g) putting its interests above those of Paramount; and

      h) otherwise acting as alleged above.

74. In breach of the implied covenant of good faith and fair dealing, Federal did the things and committed the acts alleged above for the purpose of consciously withholding from Paramount the rights and benefits which it was, and is, entitled to under the Policy.

75. Federal's acts are inconsistent with the reasonable expectations of Paramount, are contrary to the express and implied terms of the Policy, and constitute bad faith.

76. As a direct and proximate result of Federal's breach of the implied covenant of good faith and fair dealing, Paramount has sustained, and continues to sustain, damages in an amount to be proven at trial. Paramount is also entitled to recover all attorneys' fees that it reasonably incurred, and continues to incur, in its

19

**COMPLAINT**

efforts to obtain the benefits due under the Policy that Federal wrongfully withheld, and is withholding, in bad faith.  Paramount is further entitled to interest thereon at the maximum legal rate.  Paramount continues to suffer damages because of Federal's bad faith.

77.     Paramount is informed and believes, and on that basis alleges, that Federal—acting through one or more of its officers, directors, or other corporate employees with substantial independent discretionary authority over significant aspects of Federal's business—performed, authorized, and/or ratified the bad faith conduct alleged above.

78.     Federal's conduct is contemptible and has been done with a conscious disregard of Paramount's rights, constituting oppression, fraud, and/or malice. Federal has engaged in a series of acts designed to deny Paramount the benefits due under the Policy.  Specifically, Federal, by acting as alleged above, consciously disregarded Paramount's rights and forced Paramount to incur substantial financial losses, thereby inflicting substantial financial damage.  Federal ignored Paramount's interests and concerns with the requisite intent to injure under California Civil Code section 3294.  Paramount is therefore entitled to recover punitive damages from Federal in an amount sufficient to punish Federal and to deter similar conduct in the future.

## PRAYER FOR RELIEF

WHEREFORE, Paramount prays for relief as follows:

### ON THE FIRST CAUSE OF ACTION

1.     For damages, plus interest, according to proof at the time of trial;

### ON THE SECOND CAUSE OF ACTION

2.     For damages, including attorneys' fees, plus interest, according to proof at the time of trial;

3.     For punitive damages in an amount to be determined at the time of trial;

## <u>ON ALL CAUSES OF ACTION</u>

4.     For the costs of this lawsuit; and

5.     For such other, further, and/or different relief as may be deemed just
and proper.


DATED: August 30, 2021                    Kirk Pasich
                                          Anamay M. Carmel
                                          Caitlin S. Oswald

                                          PASICH LLP

                                     By: */s/ Kirk Pasich*
                                          Attorneys for Plaintiff

**COMPLAINT**

## **DEMAND FOR JURY TRIAL**

Plaintiff Paramount Pictures Corporation hereby demands a trial by jury in this action.

DATED:  August 30, 2021

Kirk Pasich
Anamay M. Carmel
Caitlin S. Oswald

PASICH LLP

By:       */s/  Kirk Pasich*
Attorneys for Plaintiff

22
**COMPLAINT**